1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

MICHAEL D. CASTRO,

10
                          Plaintiff,

11              v.

12  TRI MARINE FISH COMPANY, LLC, *et al.*,

13                          Defendants.

14

Case No. C17-8RSL

ORDER GRANTING
DEFENDANTS' MOTION TO
ENFORCE FOREIGN ARBITRAL
AWARD

15    This matter comes before the Court on Defendants' motion to enforce a foreign arbitral

16  award that was settled with plaintiff Michael D. Castro in February 2014.[1]  Dkt. # 22.  Plaintiff

17  opposes the motion, arguing that the arbitral award is invalid.  Dkt. # 27.  After reviewing the

18  parties' memoranda and exhibits, as well as the remainder of the record, the Court grants

19  Defendants' motion for the reasons that follow.

20                              **I.  BACKGROUND**

21    On July 12, 2013, Defendants' Human Resources Administrative Manager, Eufemia

22  Drandic, hired Plaintiff in American Samoa to work as a deck hand on Defendants' fishing

23  vessel, the *F/V Captain Vincent Gann*.  In Ms. Drandic's presence, Plaintiff signed an

25  ─────────────────

26      [1] Defendants move in the alternative for an order compelling arbitration. Because the Court
    grants defendants' motion to enforce the arbitration award, it need not reach this issue.

27

28  ORDER GRANTING DEFENDANTS' MOTION
    TO ENFORCE FOREIGN ARBITRAL AWARD - 1

employment contract containing an arbitration clause.[2]  Dkt. # 22-1 at 4; Dkt. # 22-2, ¶¶ 2–6.

Roughly two weeks later, Plaintiff was injured while working aboard the vessel.  Dkt. # 27-1, ¶ 5.  Because Plaintiff is a citizen of the Philippines, Defendants arranged to transport Plaintiff to Manila, where Plaintiff traveled to his parents' home.  Id. at ¶¶ 6–7.  On August 19, 2013, Plaintiff underwent surgery to repair torn ligaments in his knee.  Id. at ¶ 8.  While Plaintiff was recovering from his knee surgery, he collected maintenance and cure payments from Defendants through Rhodylyn De Torres, an employee of Defendants' Manila law firm Del Rosario Pandiphil, Inc. ("Pandiphil").  Dkt. # 22-3, ¶¶ 3–6.  Between September 2, 2013 and February 24, 2014, Plaintiff collected thirteen payments.  Dkt. # 22-3, ¶ 6; id. at 5–32.

On October 7, 2013, Plaintiff contacted Ms. Drandic about a potential $3,000 advance on his future maintenance and cure payments.  Dkt. # 22-1 at 1, 24.  The request was approved and Plaintiff received $3,000 on October 11, 2013.  Dkt. # 22-1 at 18–23.

On December 2, 2013, when collecting his regular maintenance payment from Ms. De Torres, Plaintiff expressed interest in a complete settlement with Defendants, as his monthly maintenance and cure payments were not sufficient.  Dkt. # 22-3, ¶ 7.  On January 4, 2013, Plaintiff also contacted Ms. Drandic about an additional cash advance.  Dkt. # 22-2 at 7.  He and Ms. Drandic communicated in English between January 4 and January 7, 2014.  Dkt. # 22-2 at 5–7.  On January 6, Plaintiff requested a $5,000 advance.  Dkt. # 22-2 at 6.  On January 9, Ms. De Torres was informed that Defendants wanted to send Plaintiff a $5,000 payment as an advance on any final settlement amount.  Dkt. # 22-3, ¶ 10. Plaintiff collected this payment on

---

[2]  Plaintiff testifies and argues at length that he did not sign this employment agreement until February 28, 2014, the day he executed the release of claims and received the arbitral award.  Dkt. # 27-1, ¶ 4; Dkt. # 27 at 5, 7, 23, 24–27.  But the Court finds that the weight of the evidence does not support this contention.  Defendants have produced copies of the agreement itself, which is dated July 12, 2013, Dkt. # 22-1 at 4, as well as credible testimony from Ms. Drandic regarding her hiring of Plaintiff on that date, Dkt. # 22-2.  Moreover, the employment agreement provides for arbitration in American Samoa; Defendants would have no reason to induce Plaintiff to sign this agreement for the first time during their arbitration in the Philippines.

ORDER GRANTING DEFENDANTS' MOTION
TO ENFORCE FOREIGN ARBITRAL AWARD - 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

January 15, 2014, accompanied by his girlfriend, April Castillo.  Dkt. # 22-1 at 6.

On February 14, 2014, Plaintiff and Ms. De Torres met and negotiated the amount of his final settlement.  Dkt. # 22-3, ¶ 13.  After determining from Plaintiff's physician that the cost of future physical therapy would be roughly $1,160, Plaintiff and Ms. De Torres settled on a total settlement amount of $21,160.  Dkt. # 22-3, ¶¶ 13–14.  This sum included the $5,000 cash advance that Plaintiff had already received.  Id. at ¶¶ 13–15.

On February 28, 2014, Plaintiff and Ms. Castillo met with Ms. De Torres, along with Pandiphil Claims Executives Razelle Espana and Caren Yabut, at Pandiphil's offices to execute the settlement agreement.  Dkt. # 22-4, ¶¶ 8–9.  Pursuant to Pandiphil's standard procedure, Ms. De Torres gave Plaintiff a document explaining the rights and claims to which Plaintiff was entitled as a seafarer, and explained that if Plaintiff signed the papers necessary to receive the additional $16,160 in settlement funds, he would be releasing all the parties named in the papers from any further liability.  Ms. De Torres also translated the papers into Tagalog and gave Plaintiff an opportunity to ask questions.  Dkt. # 22-4, ¶ 9; Dkt. # 22-5, ¶¶ 9–10.  Plaintiff reviewed and signed a "Receipt and Full Release," which repeatedly warned plaintiff that he was waiving all future claims against Defendants:  for example, the document included this statement in bold, capital letters:  "THIS IS A RELEASE[.]  I AM GIVING UP EVERY RIGHT I HAVE."  Dkt. # 22-1 at 9–16.  The release was witnessed by Ms. Castillo, Ms. Espana, and Ms. Yabut, and was notarized by Herbert A. Tria.  Dkt. # 22-1 at 14.

Immediately after signing the release, Plaintiff, Ms. Castillo, and Ms. Yabut brought the paperwork to the Office of the National Conciliation and Mediation Board for approval by Gregorio Biares, Jr., an accredited Maritime Voluntary Arbitrator.  Dkt. # 22-5, ¶¶ 2–11; Dkt. # 22-6, ¶¶ 2–4. After reviewing the release documents, Mr. Biares explained in both English and Tagalog the legal implications of a compromise agreement, including that it would serve as a bar against any future claims against Defendants.  Dkt. # 22-6, ¶¶ 4–5; Dkt. # 22-3, ¶ 15; Dkt. # 22-5, ¶¶ 8–9.  Plaintiff indicated that he understood the implications of the documents he had

ORDER GRANTING DEFENDANTS' MOTION
TO ENFORCE FOREIGN ARBITRAL AWARD - 3

1
2
3

signed.  Dkt. # 22-6, ¶ 5.  Accordingly, Mr. Biares entered an order finding that the signed release and resulting compromise agreement were "not contrary to law, morals, good customs and public policy" and dismissing the case between Plaintiff and Defendants.  Dkt. # 22-1 at 8.

4
5

Combining this $16,160 settlement amount with the advances for $5,000 and $3,000, Plaintiff was paid a total of $24,160.

6
7
8
9

On November 22, 2016, Plaintiff sued Defendants in King County Superior Court for negligence, unseaworthiness, maintenance and cure, and statutory wages.  Dkt. # 1 at 8–21. Defendants removed, and on February 27, 2017 moved to enforce the February 28, 2014 arbitral award barring Plaintiff's claims.  Dkt. ## 1, 22.

10

## II.  DISCUSSION

11

### A.    Standard and Scope of Review

12
13
14
15
16
17
18
19
20
21

"Our analysis begins with the strong public policy favoring confirmation of foreign arbitration awards." Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Defense Systems, Inc., 665 F.3d 1091, 1098 (9th Cir. 2011). Confirmation of foreign arbitration awards is governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, which is known as the "New York Convention" and is incorporated into United States law at 9 U.S.C. §§ 201–208. Id.  The goal of the New York Convention is to "encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." Scherk v. Alberto-Culver Co., 417 U.S. 506, 520 n.15 (1974).

22
23
24
25
26

Per 9 U.S.C. § 207, "[w]ithin three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration."  The court's "review of a foreign arbitration award is quite circumscribed." Ministry of Defense of the Islamic Republic of Iran v. Gould, Inc., 969 F.2d 764, 770 (9th Cir.

27
28

ORDER GRANTING DEFENDANTS' MOTION
TO ENFORCE FOREIGN ARBITRAL AWARD - 4

1992).  The reviewing court "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207.

Article V of the New York Convention establishes seven grounds for refusing to confirm a foreign arbitral award:  (1) the parties were under some incapacity or their agreement is otherwise invalid; (2) the party against whom the award is invoked was not given proper notice of the arbitration proceedings; (3) the award deals with matters beyond the scope of the submission to arbitration; (4) the composition of the arbitral authority or procedure was not in accordance with the parties' agreement or with the law of the country where the arbitration occurred; (5) the award has not yet become binding; (6) in the country where enforcement of the award is sought, the subject matter is not capable of settlement by arbitration; and (7) the enforcement of the award would be contrary to the public policy of that country.  <u>See</u> N.Y. Convention art. V(1).  These defenses are construed narrowly, and the burden of proving them is on the party opposing recognition of the award.  <u>Ministry of Defense</u>, 665 F.3d at 1096.

**B.    Plaintiff's Defenses to the Arbitral Award**

Plaintiff raises six defenses to enforcement of the February 2014 arbitral award.  He claims that: (1) there was no agreement to arbitrate in the Philippines, and accordingly this Court lacks jurisdiction to enforce the arbitral award; (2) the award resulted from a coerced settlement and accordingly is void; (3) he lacked notice of the arbitration proceeding; (4) the award falls outside the scope any agreement to arbitrate; (5) the selection of the arbitrator was not in line with any agreement of the parties; and (6) the alleged arbitration award is void as contrary to public policy.  Dkt. # 27.

1.    *Jurisdiction to Enforce*

Article II of the New York Convention provides that signatory states shall recognize "an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal

1  relationship, whether contractual or not, concerning a subject matter capable of settlement by

2  arbitration." N.Y. Convention art. II(1). An "agreement in writing" includes both "an arbitral

3  clause in a contract" and "an arbitration agreement . . . contained in an exchange of letters or

4  telegrams." N.Y. Convention art. II(2). Absent an agreement in writing to arbitrate, this Court

5  lacks jurisdiction to enforce an arbitral award under the Convention. N.Y. Convention art. IV.

6  In this case, Plaintiff signed two written agreements to arbitrate disputes related to his

7  employment: his employment contract, which provides that "any and all disputes" arising out of

8  his employment shall be subject to mandatory binding arbitration in American Samoa, Dkt. # 22-

9  4; and the receipt for his $5,000 advance, which provides that Plaintiff agrees to be bound by the

10  arbitration clause in his employment contract, Dkt. # 22-1 at 17. Plaintiff argues that he never

11  agreed to arbitrate employment disputes *in the Philippines*. But general contract principles apply

12  to the interpretation of agreements to arbitrate, see Int'l Paper Co. v. Schwabedissen Maschinen

13  & Anlagen GMBH, 206 F.3d 411, 416–18 (4th Cir. 2000), and here, where Plaintiff accepted the

14  $16,160 benefit of the arbitral award in the Philippines, he is estopped from asserting that the

15  arbitration was invalid because it did not occur in American Samoa. See id. at 417–18

16  ("Equitable estoppel precludes a party from asserting rights he otherwise would have had against

17  another when his own conduct renders assertion of those rights contrary to equity." (internal

18  quotation marks omitted)). The Court has jurisdiction to enforce the arbitral award.

19  2.  *Coercion*

20  Under Garrett v. Moore-McCormack Co., 317 U.S. 239 (1942), a release executed by a

21  seaman is subject to careful scrutiny due to the seaman's status as a ward of admiralty. Id. at

22  247–48. The party seeking to enforce the release has the burden "to show that it was executed

23  freely, without deception or coercion, and that it was made by the seaman with full

24  understanding of his rights." Id. at 248. Relevant to this inquiry are "the adequacy of the

25  consideration and the nature of the medical and legal advice available to the seaman at the time

26  of signing the release." Id.; see also Orsini v. O/S Seabrooke O.N., 247 F.3d 953, 959 (9th Cir.

27
28  ORDER GRANTING DEFENDANTS' MOTION
    TO ENFORCE FOREIGN ARBITRAL AWARD - 6

2001).

Defendants have met that burden here.  They have produced testimony from multiple witnesses demonstrating that Plaintiff was repeatedly informed of his rights and of the fact that he was giving up those rights in exchange for the settlement payment, orally and in writing, and in both English and Tagalog.  Plaintiff was given a document explaining the "Rights of Seamen" to claims for maintenance and cure, unseaworthiness, and recovery under the Jones Act; this document also explained that "there is no limit to the amount that a seaman can recover under any of these rights."  Dkt. # 22-1 at 16.  Ms. De Torres explained those rights orally to Plaintiff and his girlfriend, and gave them an opportunity to ask questions.  Dkt. # 22-4, ¶ 9; Dkt. # 22-5, ¶¶ 9–10.  The consequences of the release were further explained to Plaintiff by Mr. Biares, and Plaintiff affirmed that he understood.  Dkt. # 22-6, ¶¶ 4–5; Dkt. # 22-3, ¶ 15; Dkt. # 22-5, ¶¶ 8–9.

As consideration for releasing his claims against Defendants, Plaintiff received a total of $24,160.  This consideration did not include and thus was in addition to Defendant's payment for Plaintiff's transportation to Manila and for Plaintiff's medical expenses.  Under the standard payment schedule for seamen's disability allowance claims in the Philippines, someone with Plaintiff's disability grading (Grade 10, on a scale where Grade 1 is the most severe and Grade 14 is the least severe) is ordinarily entitled to disability benefits of $10,075.  Dkt. # 22-7, ¶ 20.  Plaintiff has offered no evidence supporting his contention that $24,160 is inadequate compensation for Plaintiff's damages.  And while Plaintiff was not guided by counsel at the time of the settlement, he had received medical treatment, follow-up appointments, and ongoing physical therapy.  Dkt. # 27-1, ¶¶ 7–8.

Accordingly, even considering the fiduciary principles of maritime law applicable to a release executed by a ward of admiralty, see Orsini, 247 F.3d at 959–61, the Court concludes that Plaintiff was not coerced into releasing his claims against Defendants.

3.   *Lack of Notice*

ORDER GRANTING DEFENDANTS' MOTION
TO ENFORCE FOREIGN ARBITRAL AWARD - 7

Plaintiff claims that he was given no notice of the arbitration proceedings, essentially arguing that he was not aware that the settlement proceedings were called an "arbitration." But this defense applies where a party is unable to participate meaningfully or at all in the proceedings due to a lack of notice. See N.Y. Convention art. V(b) (defense applies where the party "was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case"). Because Plaintiff personally negotiated his settlement with Ms. De Torres and personally appeared before the arbitrator, Dkt. # 27-1, ¶¶ 9–13, the Court concludes that Plaintiff had sufficient notice enabling him to participate and represent his own interests in the proceedings. As already discussed, Plaintiff understood that he was signing paperwork giving up future claims in exchange for a settlement payment that he had negotiated. Whether or not Plaintiff knew that this process constituted "arbitration proceedings," he was adequately notified of them such that he was able to advocate for himself.

    4.    *Scope of Agreement to Arbitrate*

Plaintiff claims that the award falls outside the scope of any agreement to arbitrate because it was not conducted in American Samoa. For all the reasons discussed in Part B.1, the Court rejects this defense.

    5.    *Selection of the Arbitrator*

Plaintiff argues that Defendants unilaterally selected Mr. Biares as the arbitrator and that this selection was not in line with any agreement between the parties because the arbitration did not occur in American Samoa. The Court rejects this defense as well for all the reasons discussed in Part B.1.

    6.    *Public Policy*

Finally, Plaintiff argues that the arbitral award violates public policy because the arbitrator did not apply the protections of the Jones Act to Plaintiff's release. The public policy defense is construed narrowly "in recognition of a presumption favoring upholding international

ORDER GRANTING DEFENDANTS' MOTION
TO ENFORCE FOREIGN ARBITRAL AWARD - 8

arbitration awards." <u>Ministry of Defense</u>, 665 F.3d at 1096–97. "It applies only when confirmation or enforcement of a foreign arbitration award 'would violate the forum state's most basic notions of morality and justice.'" <u>Id.</u> at 1097 (quoting <u>Parson & Whittemore Overseas Co. v. Societe Generale De L'Industrie Du Papier (RAKTA)</u>, 508 F.2d 969, 974 (2d Cir. 1974)). "Although this defense is frequently raised, it has rarely been successful." <u>Id.</u>

It is true that, as Plaintiff asserts, seamen are wards of admiralty and must be given special legal protection. <u>See</u> <u>Garrett v. Moore-McCormack Co.</u>, 317 U.S. at 247–48. At the same time, the policy favoring arbitration "applies with special force in the field of international commerce." <u>Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.</u>, 473 U.S. 614, 631 (1985); <u>Navarette v. Silversea Cruises Ltd.</u>, 169 F. Supp. 3d 1314, 1318 (S.D. Fla. 2016). In <u>Rogers v. Royal Caribbean Cruise Line</u>, 547 F.3d 1148 (9th Cir. 2008), the Ninth Circuit confronted a possible conflict between these two policies and held that the provision of the Federal Arbitration Act that exempts arbitration agreements in seamen's employment contracts, 9 U.S.C. § 1, does *not* exempt arbitration agreements in maritime employment contracts that are otherwise enforceable under the New York Convention. <u>See id.</u> at 1152–54. The Ninth Circuit found that the plaintiffs had "not shown that any public policy favoring seafarers is sufficient to overcome the public policy favoring international arbitration." <u>Id.</u> at 1159; <u>see also</u> <u>Balen v. Holland America Line Inc.</u>, 583 F.3d 647, 653–54 (9th Cir. 2009).

Moreover, in the context of a motion under the New York Convention, courts must consider "concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes . . . even assuming that a contrary result would be forthcoming in a domestic context." <u>Asignacion v. Rickmers Genoa Schiffahrtsgesellschaft</u>, 783 F.3d 1010, 1018 (5th Cir. 2015) (quoting <u>Mitsubishi</u>, 473 U.S. at 629). To put a finer point on it, "[s]imply because a foreign arbitral award provides for a smaller recovery than may have been available under United States maritime law does not necessarily mean the award violates public policy."

ORDER GRANTING DEFENDANTS' MOTION
TO ENFORCE FOREIGN ARBITRAL AWARD - 9

Navarette, 169 F. Supp. 3d at 1317 (citing Lindo v. NCL (Bahamas), Ltd., 652 F.3d 1257, 1283 (11th Cir. 2001)).

Indeed, in this case it appears that Plaintiff obtained many of the benefits to which he would be entitled under U.S. maritime law:  Defendants transported Plaintiff to his home country, arranged for his medical care, and paid maintenance and cure during Plaintiff's hospitalization and recovery.  During settlement proceedings, Defendants' agents took abundant precautions to ensure that Plaintiff understood the nature of the rights he was waiving by signing the release paperwork.  Plaintiff argues that he was unfairly disadvantaged in the settlement proceedings by the "great emphasis" placed on the recovery to which he was entitled under the Philippines' disability benefits schedule. Dkt. # 27 at 22.  But that benefits schedule was created by the Philippine Overseas Employment Administration, which "closely regulates the employment of Filipino seamen by foreign corporations" and which has a "mandate to promote and monitor the overseas employment of Filipinos and *safeguard their interests*."  Balen, 583 F.3d at 650–51 (emphasis added).  In any event, Plaintiff ultimately recovered more than twice the amount prescribed by the POEA benefits schedule.

In sum, despite Plaintiff's status as a ward of admiralty, Plaintiff's arbitral award does not offend the United States' "most basic notions of morality and justice."  Parson & Whittemore Overseas Co., 508 F.3d at 974.  It can and will be enforced.

### III.  CONCLUSION

For all of the foregoing reasons, defendants' motion to enforce the foreign arbitral award (Dkt. # 22) is GRANTED.  Plaintiff's case is therefore dismissed.  The Clerk of Court is directed to enter judgment against Plaintiff and in favor of Defendants.


DATED this 31st day of July, 2017.

Robert S. Lasnik
United States District Judge

ORDER GRANTING DEFENDANTS' MOTION
TO ENFORCE FOREIGN ARBITRAL AWARD - 10